# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

ANTHONY KEEPERS,

                    Plaintiff,

v.                                                      Case No. 23-CV-1199-JPS

CHARLES DOMBECK and DR.
DANIEL LAVOIE,                                          **ORDER**

                    Defendants.

Plaintiff Anthony Keepers ("Plaintiff"), who is currently incarcerated at Waupun Correctional Institution ("WCI"), filed a pro se complaint under 42 U.S.C. § 1983 alleging violations of his constitutional rights. ECF No. 1. On November 22, 2023, the Court screened the complaint and allowed Plaintiff to proceed on an Eighth Amendment claim for deliberate indifference to his serious medical needs against Defendants Charles Dombeck ("Dombeck"), Dr. Daniel LaVoie ("LaVoie"), and various Doe defendants. ECF No. 7 at 6. On February 5, 2025, the Court dismissed the Does from the case without prejudice because Plaintiff failed to identify these individuals. ECF No. 45.

Now pending before the Court is Defendants' motion for summary judgment, filed on March 4, 2025, ECF No. 46. On March 19, 2025, Plaintiff filed a motion for consideration, ECF No. 53, which is liberally construed as a motion for an extension of time. Thereafter, Plaintiff filed his brief in opposition. ECF No. 54. The Court will grant Plaintiff's motion for an extension of time and finds that Plaintiff's opposition was timely. On April 17, 2025, Defendants filed a reply brief. ECF No. 58. As described below, the

Court will grant Defendants' motion for summary judgment and will dismiss this case with prejudice.

1. **LEGAL STANDARD – SUMMARY JUDGMENT**

Under Federal Rule of Civil Procedure 56, the "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56; *Boss v. Castro*, 816 F.3d 910, 916 (7th Cir. 2016). A fact is "material" if it "might affect the outcome of the suit" under the applicable substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute of fact is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

The Court construes all facts and reasonable inferences in a light most favorable to the nonmovant. *Bridge v. New Holland Logansport, Inc.*, 815 F.3d 356, 360 (7th Cir. 2016). In assessing the parties' proposed facts, the Court must not weigh the evidence or determine witness credibility; the Seventh Circuit instructs that "we leave those tasks to factfinders." *Berry v. Chi. Transit Auth.*, 618 F.3d 688, 691 (7th Cir. 2010).

2. **FACTUAL BACKGROUND**

In compliance with the Court's scheduling order, Defendants submitted a stipulated set of joint facts, ECF No. 48, and a set of genuinely disputed facts, ECF No. 49. In violation of the Court's summary judgment protocols, Plaintiff also submitted proposed findings of fact. ECF No. 56. Defendants responded to Plaintiff's proposed findings, arguing that they are filed in violation of the Court's order. ECF No. 59. The Court need not consider Plaintiff's proposed findings of fact because they violate the Court's order. However, in light of Plaintiff's pro se status and a more complete analysis on the merits, the Court has addressed Plaintiff's

proposed facts where appropriate. Thus, the following facts are taken directly from the parties' proposed findings of fact with only minor edits for grammar and formatting.

Plaintiff is an inmate in the custody of the Wisconsin Department of Corrections ("DOC") and was housed at WCI at all times relevant to this lawsuit. Dombeck is employed by DOC's Bureau of Health Services ("BHS") as an Advanced Practice Nurse Prescriber ("APNP") at Dodge Correctional Institution ("DCI"). He has held this position since February 1, 2021. Dombeck has been continuously licensed as an APNP in the State of Wisconsin since 2017. LaVoie is employed by DOC's BHS as the Medical Director. He has held this position since March 2021. Prior to this, he was employed as a physician and Associate Medical Director out of Green Bay Correctional Institution. LaVoie has been continuously licensed as a physician in the State of Wisconsin since 1993.

Plaintiff had previously been prescribed gabapentin for his nerve pain. Gabapentin has the potential for being addictive and there is a risk of overdose. Regular blood testing is done to ensure that the patient is taking their medication as prescribed, and they are receiving a therapeutic level. On November 16, 2022, Plaintiff's blood serum level was extremely low, indicating he was accepting his doses of gabapentin but not actually taking them, thereby diverting his gabapentin. Dombeck discussed this with Plaintiff's assigned ACP, APNP Fields, and they agreed to discontinue the gabapentin for misuse/diversion. If a patient diverts or misuses their gabapentin, it will be discontinued and will not be reinstated unless all other options are exhausted. On November 21, 2022, Dombeck became Plaintiff's assigned advanced care provider ("ACP") after Plaintiff spat in APNP Fields's face and threatened her. On December 3, 2022, Plaintiff

submitted an HSR in which he stated that unless his gabapentin was reinstated, he was no longer going to take his insulin and was going on a hunger strike starting December 5, 2022.

Plaintiff has Type I Diabetes. This means he is completely dependent on insulin. Insulin is a hormone the body uses to allow sugar (glucose) into the cells to produce energy. In Type 1 Diabetics, the body is unable to produce enough insulin which results in too much sugar building up in the bloodstream, referred to as hyperglycemia. Symptoms of high blood sugar (hyperglycemia) include increased thirst/hunger, frequent urination, headaches, and blurred vision. Long-term hyperglycemia can lead to fatigue, weight loss, skin infections, and slow-healing cuts and sores. For people with Type 1 Diabetes, the recommended blood sugar targets before meals should be between around 80 and 130 mg/dL, but anything under 150 mg/dL is acceptable. After meals, the recommended targets should be no higher than 180mg/dL two hours after eating. These are ideal targets and only possibly achievable by using frequent doses of insulin.

Untreated hyperglycemia can lead to diabetes-related ketoacidosis ("DKA"). DKA develops when the body does not have enough insulin. Without enough insulin, the body will begin to break down fat as energy. This causes a buildup of acids in the blood called ketones, which can build to a dangerous level in the body. DKA usually develops slowly with the first symptoms being excessive thirst/urination, high glucose levels, and high levels of ketones in the urine. More severe symptoms include stomach pain, nausea, vomiting, fatigue, muscle stiffness/aches, headache, fruity-smelling breath, a flushed face, dry skin/mouth, and difficulty breathing.

If a patient in DKA does not receive treatment, the buildup of ketones can trigger a diabetic coma. A diabetic coma can lead to brain

damage or death if not treated in a timely manner. Treatment for DKA includes pushing IV fluids and electrolytes, receiving insulin, and taking medications for underlying illnesses that may cause DKA. Most individuals recover from DKA within a day; however, sometimes it may take longer. DKA is preventable through frequent blood sugar checks, keeping blood sugar levels within target ranges, and taking insulin and medications as prescribed. Treatment for a DKA-related coma includes IV fluids, insulin, and treating any underlying conditions or infections that may have caused the high blood sugar.

On December 5, 2022, HSU received Plaintiff's HSR and began to monitor him for his hunger strike, per policy. On December 5, 2022, Plaintiff took his dinner but refused all insulin. On December 6, 2022, Plaintiff refused breakfast and lunch, as well as all insulin. On December 6, 2022, Dombeck saw Plaintiff with Nurse Bleecker. Plaintiff informed Dombeck that he intended to go on a hunger strike and refuse all insulin because his gabapentin was stopped, and he would not start taking his insulin until his gabapentin was restarted. Dombeck informed Plaintiff that he would not be restarting Plaintiff's gabapentin because it is a controlled substance that was discontinued due to diversion. Dombeck asked Plaintiff if there was anything else he could do to help Plaintiff, and Plaintiff shook his head "no. Dombeck explained to Plaintiffs how dangerous his actions were and how they could lead to serious harm or death. Plaintiff told Dombeck that he was aware. Dombeck informed Plaintiff that HSU would continue to monitor his condition. During their discussion, Dombeck carefully discussed the medicolegal and ethical questions raised by Plaintiff's desire to refuse treatment until he received gabapentin or until treatment was court-ordered. They discussed the circumstances required to seek an ex

parte order, including specifically, that Plaintiff must be "in danger of suffering serious harm or death," and that "danger to the inmate [is] imminent." Dombeck's recollection was that Plaintiff asked something to the effect of "So, basically I'm going to have to keel over?" to which Dombeck indicated in the affirmative, as this would be one way of describing imminent danger. Plaintiff's version of this incident is that Dombeck would not seek a court order until Plaintiff "keeled over." ECF No. 56 at 1.

From December 6 through December 11, 2022, Plaintiff was seen by nursing multiple times per day to offer a blood sugar check and insulin. Some days, Plaintiffs would allow his blood sugar to be tested while on others he refused. He continued to consistently refuse insulin, but did accept a few doses on December 7, 8, 10, and 11. His blood sugars were high, generally between 282 mg/dL and 541 mg/dL. On December 11, 2022, Plaintiff was removed from a meal monitor after regularly eating for several days. Plaintiff describes in his proposed facts that he refused the "vast majority of inulin shots" from December 5, 2022 through February 20, 2023. ECF No. 56 at 1.

On December 12, 2022, Plaintiffs was seen by Nurse Hosfelt for a blood sugar check and asked about increasing his limit of Excedrin. Dombeck had been previously notified of this request and had ordered short round acetaminophen for Plaintiff but noted that his headaches may be attributed to him refusing his insulin. Nurse Hosfelt relayed this information to Plaintiff and advised him to take ibuprofen for headaches and start taking his insulin. Plaintiff became upset and said he would consider taking his insulin once he had more Excedrin. He also told Nurse Hosfelt that HSU needed to get a court order. Nurse Hosfelt relayed this

contact with Plaintiff to Dombeck. Dombeck advised her to continue with Plaintiff's current plan of care and monitoring.

On December 13, 2022, HSU received an HSR and letter from Plaintiff addressed to Dombeck in which he accused Dombeck of being aware he was dying and allowing it to happen. He also expressed that he was experiencing chest pain, blurry vision, dehydration, rapid heartbeat, hot/cold flashes, headaches, and shortness of breath. APNP Dombeck responded to this letter stating, "I recommend you take your insulin. DOC will not obtain a court order until there is a critical need. I can't force you to do anything without a court order. You are risking your life denying yourself treatment per our discussion."

On December 12, 13, and 14, 2022, Plaintiff accepted his morning insulin doses but refused all others. Between December 14 and 29, 2022, Plaintiff continued to be offered blood sugar checks and insulin by nursing staff. Either Dombeck or the on-call doctor would be updated with Plaintiff's high blood glucose levels. Plaintiff was provided with education by nursing on the dangers of refusing insulin. Plaintiff's blood glucose levels continued to be high. Between December 16 and 23, 2022, Plaintiff took at least one dose of insulin per day. On December 16, 2022, Dombeck asked for Dr. Sukowaty's advice on the next steps, as he believed there was not much else that HSU could do until Plaintiff had a change in condition.

Dr. Sukowaty responded to Dombeck's email by confirming that Dombeck was correct. She advised that DOC had gotten a court order for Plaintiff in the past and they could get another, but they needed to be mindful of taking away a patient's constitutional right to make decisions. She asked if Dombeck believed Plaintiff was sick enough to justify a court order. Dombeck responded to Dr. Sukowaty by advising that, in his

opinion, Plaintiff had not reached the imminent danger necessary to justify a court order and HSU would continue to monitor him.

As the Medical Director, LaVoie normally does not provide patient care. His position is generally administrative and supervisory in nature. On December 20, 2022, LaVoie was the on-call provider. At around 7:30 p.m., LaVoie received a call from Nurse Hosfelt advising that Plaintiff had a blood sugar level of 570 mg/dL at his evening check. LaVoie believes this is the first time that he was informed that Plaintiff was on an insulin strike.

LaVoie encouraged the nurse to provide further education on the possible consequences of refusing insulin and to monitor Plaintiff for any signs of DKA. On December 24, 2022, LaVoie was again the on-call provider. At around 7:20 a.m., LaVoie received a call from Nurse Hiland advising that Plaintiff's blood sugar level was 482 mg/dL, and he refused both regular and glargine insulin. On December 24, 2022, at approximately 1:40 p.m., LaVoie received another call from Nurse Hiland advising that Plaintiff reported heart palpitations and that he was feeling terrible. Plaintiff continued to refuse to take insulin. Based on Nurse Hiland's assessment, LaVoie did not believe Plaintiff was currently in DKA, but he encouraged Nurse Hiland to continue monitoring Plaintiff for progressing symptoms or signs of DKA. If Plaintiff continued to decline, Dr. LaVoie expected Nurse Hiland would call back for further instruction or send Plaintiff to the emergency room.

On December 25, 2022, Plaintiff accepted insulin three of the four times he was offered. He continued to accept at least one dose of insulin per day until December 28, 2022. On December 29, 2022, Dombeck entered a communication order for nursing to continue to offer blood sugar testing ("accu-checks") and insulin but noted that nursing did not need to contact

an ACP with elevated readings unless Plaintiff was experiencing a change in his condition.

Between December 29 and December 31, 2022, Plaintiff refused all insulin and only allowed his blood sugar to be checked twice. On December 29, 2022, Plaintiff' blood sugar was 565 mg/dL. On December 31, 2022, Plaintiff' blood sugar was 389 mg/dL. On December 31, 2022, Plaintiff was seen by Nurse Leberak and reported that he was not feeling well and was having symptoms of DKA. Plaintiff was sent to the Waupun Memorial Hospital for evaluation and treatment. At approximately 11:18 a.m., Plaintiff was admitted to the Waupun Memorial Hospital emergency room, where he reported that he had stopped taking insulin due to issues with staff at the institution.

At the hospital on December 31, 2022, Plaintiff reported feeling dizzy, nauseous, and fatigued. He denied chest pain or shortness of breath but did have a headache. He underwent diagnostic testing, including an EKG, bloodwork, urinalysis, chest x-ray, and glucose monitoring. Upon admission, his blood glucose level was 738 mg/dL. Plaintiff was found to be in DKA with high blood sugars and very low sodium. His anion gap was also high, which is a blood test used to check the pH balance of the blood. He was started on IV fluids and insulin, at which time he started to improve. By 6:58 p.m., Plaintiff was no longer in DKA. Doctors planned to monitor him for a few more hours and if he continued to do well, he would be discharged. At 11:45 p.m., Plaintiff's glucose level was down to 221 mg/dL. On January 1, 2023, at approximately 2:25 a.m., Plaintiff was discharged from the emergency room with a diagnosis of DKA without coma and hyponatremia (low sodium). Upon his return to the institution,

Plaintiff was evasive in answering the nurse about whether he would comply with taking his insulin but accepted all doses of insulin that day.

On January 2, 2023, Plaintiff refused all insulin and blood sugar testing. On January 3, 2023, Plaintiff accepted his morning insulin doses but refused all others. On January 3, 2023, Dombeck saw Plaintiff for a follow-up. Plaintiff was not exhibiting signs of DKA at this appointment. He was slightly tachycardic, meaning his heart was beating faster than average; however, this was normal for him. On January 3, 2023, Plaintiff informed Dombeck that he had no intention of resuming his normal insulin and intended to keep refusing until he was court-ordered to be given insulin against his will. Dombeck again encouraged Plaintiff to comply with his insulin and inform staff if he was having any symptoms of DKA. Dombeck also ordered lab testing and a follow-up in a month. Between January 4 and January 6, 2023, Plaintiff continued to refuse insulin. He also refused some of his blood sugar testing. Plaintiff's blood sugars remained high.

On January 6, 2023, at approximately 7:30 a.m., Plaintiff was lethargic, weak, and confused during morning medication pass. His blood glucose level was 372 mg/dL and he requested to be sent to the hospital. APNP Diana Simmons was contacted and requested that Plaintiff be sent to the emergency room. At approximately 8:06 a.m., Plaintiff was admitted to the Waupun Memorial Hospital emergency room, where he reported that he had not been administering his insulin due to an argument with DOC regarding getting his gabapentin back. At the hospital on January 6, 2023, Plaintiff reported he was feeling sick and weak, vomited the day prior, and had abdominal pain, chest pain, and a mild cough. He was admitted to the hospital and underwent diagnostic testing, including an abdominal CT,

chest x-ray, bloodwork, EKG, urinalysis, and glucose monitoring. Upon admission, Plaintiff's glucose level was 388.

At 4:45 p.m., Plaintiff was admitted to the intensive care unit ("ICU") from the ER for observation. Plaintiff was found to be in DKA, and his sodium and potassium levels were low. He was also initially tachycardic, but this was resolved with IV fluids. He was placed on IV fluids, potassium replacement, and insulin, at which time he began to improve. On January 7, 2023, at approximately 12:35 p.m., Plaintiff was discharged from the hospital with a diagnosis of DKA without coma, unspecified chest pain, and abdominal pain. At discharge, his blood glucose level was 213 mg/dL.

Between January 7 and January 13, 2023, Plaintiff accepted a few doses of insulin but largely refused the doses. On January 13, 2023, at approximately 4:58 p.m., Plaintiff was seen by Nurse Bleecker after she received a call from a sergeant saying Plaintiff appeared confused. Plaintiff refused to speak with Nurse Bleecker or allow an assessment, but Nurse Bleecker noted that Plaintiff had fruity smelling breath. Dr. Murphy, the on-call physician, was contacted and requested that Plaintiff be sent to the emergency room. At approximately 5:34 p.m., Plaintiff was admitted to the Waupun Memorial Hospital emergency room, where he reported that he had not taken his insulin "for a couple of weeks" due to disagreements at the institution. Plaintiff also told a nurse that he had been doing this every week because he wanted DOC to get a court order so he could talk to a judge. At the hospital on January 13, 2023, Plaintiff reported feeling fatigue, abdominal pain and nausea. He was also tachycardic. Plaintiff underwent diagnostic testing, including bloodwork and glucose monitoring. Plaintiff was found to be in DKA without coma with an anion gap of 30. At 6:32 p.m., Plaintiff' glucose level was 527 mg/dL. Plaintiff was started on IV fluids and

insulin, at which time he started to improve. On January 14, 2023, at approximately 8:45 a.m., Plaintiff was discharged from the emergency room back to Waupun after a frank discussion with the ER doctor about taking his insulin and possible lethal consequences of DKA. At 7:47 a.m., prior to discharge, Plaintiff's blood glucose was 148 mg/dL.

On January 13, 2023, Nurse Bleecker emailed Dombeck asking about Plaintiff's diet orders for a breakfast bag, evening bag, and supper snack bag, as well as Kool Aid for his meals, which had expired on December 22. Dombeck did not renew these diet orders, as they were no longer clinically indicated. Between January 14 and January 19, 2023, Plaintiff accepted most of his insulin doses. On January 18, 2023, Dombeck messaged Ms. Hilbrans to reschedule his follow-up with Plaintiff to the following month. This was done because Dombeck had just seen Plaintiff on January 6 and Dombeck had reviewed Plaintiff's offsite hospital paperwork. At the hospital, Plaintiff told a nurse that he was on an insulin strike so he could speak to a judge, which indicated to Dombeck that his actions were intended to be manipulative. In Dombeck's opinion, there were no other changes that he could make to Plaintiff's plan of care if Plaintiff intended to continue his insulin strike regardless. Dombeck also wanted to give Plaintiff time to change his mind and behavior for his own health.

Between January 20-24, 28, 30-31, and February 1-5, 2023, Plaintiff accepted most of his insulin doses but refused doses on the other days. During this time, his blood sugar levels were lower, between 95-295 mg/dL. The days that Plaintiff refused insulin, his blood sugars were in the 300-400s. Between February 6 and February 10, 2023, Plaintiff refused all insulin and blood sugar testing. On February 10, 2023, Plaintiff was seen by Nurse Bleecker for his morning blood sugar check. He informed Nurse Bleecker

that he felt he was in DKA and needed to go to the hospital. He was lethargic and appeared confused but refused to allow his blood sugar to be checked. Nurse Bleecker contacted APNP Simmons, who opted to send Plaintiff to the emergency room.

At approximately 7:47 a.m., Plaintiff was admitted to the Waupun Memorial Hospital emergency room, where he reported that he refused his insulin in protest because he was not able to get in contact with his DOC doctor and that he was "at war with the doctor." At the hospital on February 10, 2023, he reported feeling nausea, vomiting, headache, and constipation. He underwent diagnostic testing, including abdominal x-ray, EKG, bloodwork, urinalysis, and glucose monitoring. At 7:53 a.m., Plaintiff's blood glucose level was 442 mg/dL.

At 12:40 p.m., Plaintiff was transferred to the General Medical Floor for inpatient care from the emergency room. He was found to be in DKA with anion gap metabolic acidosis and acute kidney injury ("AKI") with hyponatremia secondary to refusal to be treated at the prison. He was started on IV fluids and insulin, at which time he began to improve. On February 12, 2023, at approximately 9:48 a.m., Plaintiff was discharged from the hospital with diagnoses of: (1) dizziness; (2) leukocytosis, unspecified type; (3) electrolyte imbalance; (4) nausea and vomiting, unspecified vomiting type; (5) DKA without coma; (6) sinus tachycardia; (7) non-compliance; (8) generalized abdominal pain; (9) hyponatremia; (10) hypokalemia (low potassium); and (11) hypomagnesemia (low magnesium). His blood glucose level at 8:08 a.m. was 150 mg/dL. The diagnoses listed by the hospital were all linked to Plaintiff's DKA.

Upon return to the institution, Plaintiff refused vitals, assessment, and his blood sugar checks. On February 12-13, 2023, Plaintiff refused all

insulin and blood sugar tests. On February 14-15, 2023, Plaintiff accepted a few doses of insulin and blood sugar tests but refused others. His blood sugars were high. On February 16-18, 2023, Plaintiff refused all insulin and blood sugar tests. On February 17, 2023, Nurse Hiland went to RHU to speak with Plaintiff to see if he would be willing to try a new medication, carbamazepine, for his pain to replace his gabapentin. Carbamazepine is an anticonvulsant that has been found effective in treating nerve pain. Plaintiff said he would take the carbamazepine but would continue refusing his insulin until a court order was obtained. He was encouraged again to take insulin due to the effects of hyperglycemia on the body.

On February 17, 2023, Dombeck entered the prescription for Plaintiff to take carbamazepine after Nurse Hiland relayed her note to Dombeck. On February 17, 2023, Dombeck completed portions of the DOC-2801 Office of Legal Counsel Referral for Temporary Ex Parte Order form and provided it to Dr. Sukowaty. The form needed to be finalized by a physician, so Dombeck sent it to Dr. Sukowaty to review and finalize. On February 18, 2023, at approximately 11:55 p.m., Sergeant Thompson called Nurse Vick in HSU stating that Plaintiff was asking to go to the hospital. Plaintiff was brought to the RHU exam room. He had vomited, his color was pale, and he had a fruity smell about him. He reported his head hurt and he felt like he was going to die. His blood glucose level was 379 mg/dL. Nurse Vick had Plaintiff transported to the hospital via ambulance.

On February 19, 2023, at approximately 12:29 a.m., Plaintiff was admitted to the Waupun Memorial Hospital emergency room, where he reported that he had been refusing to take his insulin over the past week because of a disagreement with his medical doctor about his insulin administration. Plaintiff denied upper respiratory symptoms, abdominal

pain, diarrhea, genitourinary symptoms, or chest pain, but did state that he had a migraine, vomited recently, and was feeling short of breath and it felt difficult to take a deep breath with his current symptoms. He also reported that he was drinking fluids but had not eaten for two days. At approximately 2:55 a.m., Plaintiff was transferred to the ICU for further management of DKA, hypokalemia, dehydration and acute kidney injury, hyponatremia, and leukocytosis (high white blood cell count). He was started on IV fluids, insulin, and sodium bicarbonate (bicarb), at which point he began to improve.

On February 20, 2023, Dr. Sukowaty completed her portion of the DOC-2801 Office of Legal Counsel Referral for Temporary Ex Parte Order form and submitted it to the Medical Director, La Voie. La Voie finalized the form and submitted it to the OLC Mailbox. On February 20, 2023, DOC Attorney Elizabeth Longo filed Dodge County Case No. 23CV0070, *State of Wisconsin Department of Corrections vs. Anthony G. Keepers*, requesting a temporary ex parte order authorizing the DOC to forcibly treat and deliver health services to Plaintiff.

On February 21, 2023, Judge Kristine Snow signed the Temporary Ex Parte Order authorizing the DOC to forcibly treat and deliver health services to Plaintiff. An order for court ordered insulin was entered into the medical record the same day. On February 21, 2023, Dombeck saw Plaintiff for a chronic care appointment. They discussed the court order that was obtained to mandate his treatment. Plaintiff reported he planned to be compliant with treatment. Dombeck planned to follow up with Plaintiff in a month to adjust his insulin and check compliance. On March 8, 2023, Dombeck sent Plaintiff a letter responding to his complaints and encouraging him to not engage in actions such as a hunger strike, which he

was aware could cause negative health effects, permanent harm, disability, and/or death. Between February 20, 2023, and March 14, 2023, Plaintiff was compliant with most of his insulin doses. During this time, his blood sugar levels were under much better control, averaging in the 100-200s. On March 13, 2023, Judge Snow signed the final order authorizing the DOC to forcibly treat and deliver health services to Plaintiff after he failed to appear for the scheduled hearing.

On March 13, 2023, Plaintiff sent another letter to HSU addressed to Dombeck in which he reported he would be starting a hunger strike the following day because Dombeck would not give him his diet back. On March 14, 2023, Plaintiff was seen by Nurse Hiland for an accu-check and insulin and Plaintiff initially refused. He eventually complied and his blood sugar was low, at 56 mg/dL. Plaintiff tried to refuse any carbohydrate substitution but agreed to take glucose tabs, which raised his level to 97 mg/dL. Nurse Hiland encouraged Plaintiff to eat, but he would not say whether he would comply. Dombeck entered an order into the system to adjust Plaintiff's insulin to accommodate his hunger strike. This included giving Plaintiff his glargine insulin as ordered and 3 units of regular insulin before meals if he stated he intended to eat. If he did not intend to eat, no insulin was to be given as to not spike his blood sugar. Nursing was to follow the sliding scale as ordered.

This plan of care was not ideal for nursing staff because the timing of meals is often variable. As such, it was difficult for nurses to determine whether insulin should be given depending on how long before meals they would see Plaintiff and whether he was honest about if he would be eating. On March 15, 2023, no meal monitor was indicated because Plaintiff was eating. Between March 15 and March 21, 2023, Plaintiff accepted almost all

of his doses of insulin, and his blood sugars remained under control. On March 20, 2023, HSU noted that Plaintiff was being monitored after he refused lunch and dinner but accepted peanut butter crackers.

On March 22, 2023, Plaintiff refused his afternoon insulin dose, stating he was refusing insulin and meals until his evening insulin was halved. He eventually complied with taking his insulin. On March 22, 2023, Plaintiff also wrote a letter addressed to Dombeck in which he stated that he would be starting a hunger strike. Because he was on forced insulin, he argued that he would be in immediate danger from not eating and continuing to take insulin, which he intended to continue to do. On March 23, 2023, Plaintiff started eating and on March 27, 2023, he was removed from his meal monitor. In April 2023, Dombeck was no longer assigned to assist at Waupun and Plaintiff was no longer assigned to his caseload; however, Dombeck remains available to assist Waupun as needed.

Upon review of the records from Waupun Memorial Hospital, Dombeck does not believe that Plaintiff was ever close to death during the timeframe relevant to this lawsuit. Plaintiff was not refusing all insulin for long periods of time. He was intermittently accepting doses of insulin, so Dombeck did not believe that Plaintiff was in a situation where he was progressively declining. Plaintiff has been repeatedly and thoroughly educated on his condition and the dangers of refusing insulin. Despite this education and knowledge of the consequences, he continues to intermittently refuse insulin or go on hunger strike if he does not get his way. Dombeck ultimately decided to move forward with a court order for Plaintiff in collaboration with LaVoie, Dr. Sukowaty, and other medical staff.

The term "brittle diabetes" is not an official medical diagnosis. It is a term that healthcare providers use to describe diabetes that is difficult to manage. People with brittle diabetes experience sudden and frequent changes in their glucose levels, which lead to frequent low or high blood sugar. In Dombeck's opinion, Plaintiff uses the term "brittle diabetic" to imply that his diabetes is somehow more serious and more difficult to control than any other individual with Type 1 Diabetes. Other individuals with Type 1 Diabetes can and do experience similar problems controlling their blood sugar when they do not follow medical recommendations. In patients with long-term poorly controlled diabetes, they may develop significant insulin resistance, which is when the body builds a tolerance to insulin and the cells struggle to properly absorb glucose. Consequently, the body requires larger insulin doses to elicit the same physiological effect. This leads to the patient's diabetes being harder to control.

LaVoie's involvement in Plaintiff's care during the timeframe relevant to this lawsuit was limited to advising Dombeck regarding a potential court order, approving the DOC-2801 Office of Legal Counsel Referral for Temporary Ex Parte Order form, and a few instances of being the on-call doctor contacted for Plaintiff's high blood sugars. LaVoie did not provide direct medical care to Plaintiff. Any opinion given by Dombeck and LaVoie in their declarations is based on their training and experience as an APNP and a physician, respectively, and are to a reasonable degree of medical certainty.

**3.     ANALYSIS**

Defendants brought a motion for summary judgment seeking dismissal of the Eighth Amendment claim for deliberate inference to Plaintiff's serious medical need. ECF No. 46. Based on the Court's review

of the parties' submissions, and for the reasons explained below, the Court will grant Defendants' motion for summary judgment and will dismiss this case with prejudice.

### 3.1    Eighth Amendment Standard

To prove that Defendants violated his rights under the Eighth Amendment, Plaintiff must present evidence establishing that he suffered from "'an objectively serious medical condition'" and that Defendants were "'deliberately, that is subjectively, indifferent'" to that condition. *Whiting v. Wexford Health Sources, Inc.*, 839 F.3d 658, 662 (7th Cir. 2016) (quoting *Duckworth v. Ahmad*, 532 F.3d 675, 679 (7th Cir. 2008)). A prison official shows deliberate indifference when he or she "realizes that a substantial risk of serious harm to a prisoner exists, but then disregards that risk." *Perez v. Fenoglio*, 792 F.3d 768, 776 (7th Cir. 2015) (citing *Farmer v. Brennan*, 511 U.S. 825, 837 (1994)).

"'A medical condition need not be life-threatening to be serious; rather, it could be a condition that would result in further significant injury or unnecessary and wanton infliction of pain if not treated.'" *Roe v. Elyea*, 631 F.3d 843, 857 (7th Cir. 2011) (quoting *Gayton v. McCoy*, 593 F.3d 610, 620 (7th Cir. 2010)). A broad range of medical conditions may be sufficient to meet the objective prong of a deliberate indifference claim, including a dislocated finger, a hernia, arthritis, heartburn and vomiting, a broken wrist, and minor burns sustained from lying in vomit. *Id.* at 861 (citing *Edwards v. Snyder*, 478 F.3d 827, 831 (7th Cir. 2007) (collecting cases)). On the other hand, a prison medical staff "that refuses to dispense bromides for the sniffles or minor aches and pains or a tiny scratch or a mild headache or minor fatigue—the sorts of ailments for which many people who are not in prison do not seek medical attention—does not by its refusal violate the

Constitution." *Gutierrez v. Peters*, 111 F.3d 1364, 1372 (1997) (quoting *Cooper v. Casey*, 97 F.3d 914, 916 (7th Cir. 1996)).

Under the Eighth Amendment, an incarcerated person does not have the right to direct his own course of treatment. *See Burton v. Downey*, 805 F.3d 776, 785 (7th Cir. 2015). Likewise, an incarcerated person's disagreement "about the proper course of treatment generally is insufficient, by itself, to establish an Eighth Amendment violation." *Pyles v. Fahim*, 771 F.3d 403, 409 (7th Cir. 2014) (citing *Johnson v. Doughty*, 433 F.3d 1001, 1013 (7th Cir. 2006)). But neither may prison officials "doggedly persist[ ] in a course of treatment known to be ineffective." *Greeno v. Daley*, 414 F.3d 645, 655 (7th Cir. 2005). To defeat Defendants' motion for summary judgment, Plaintiff must present evidence showing the treatment he received was "'so blatantly inappropriate as to evidence intentional mistreatment likely to seriously aggravate' his condition." *Id.* at 654 (quoting *Snipes v. DeTella*, 95 F.3d 586, 592 (7th Cir. 1996)).

Assessing the subjective prong is more difficult in cases alleging inadequate care as opposed to a lack of care. Without more, a "mistake in professional judgment cannot be deliberate indifference." *Whiting v. Wexford Health Sources, Inc.*, 839 F.3d 658, 662 (7th Cir. 2016). The Seventh Circuit has explained:

> By definition a treatment decision that's based on professional judgment cannot evince deliberate indifference because professional judgment implies a choice of what the defendant believed to be the best course of treatment. A doctor who claims to have exercised professional judgment is effectively asserting that he lacked a sufficiently culpable mental state, and if no reasonable jury could discredit that claim, the doctor is entitled to summary judgment.

*Id.* (citing *Zaya v. Sood*, 836 F.3d 800, 805-806 (7th Cir. 2016)). This is in contrast to a case "where evidence exists that the defendant [ ] knew better than to make the medical decision[ ] that [he] did[.]" *Id.* (quoting *Petties v. Carter*, 836 F.3d 722, 731 (7th Cir. 2016)) (alterations in original). A medical professional's choice of an easier, less efficacious treatment can rise to the level of violating the Eighth Amendment where the treatment is known to be ineffective but is chosen anyway. *See Berry v. Peterman*, 604 F.3d 435, 441 (7th Cir. 2010).

Finally, "[a] delay in treating non-life-threatening but painful conditions may constitute deliberate indifference if the delay exacerbated the injury or unnecessarily prolonged an inmate's pain." *Arnett v. Webster*, 658 F.3d 742, 753 (7th Cir. 2011) (citing *McGowan v. Hulick*, 612 F.3d 636, 640 (7th Cir. 2010)). The length of delay that is tolerable "'depends on the seriousness of the condition and the ease of providing treatment.'" *Id.* (quoting *McGowan*, 612 F.3d at 640). To prevail on an Eighth Amendment claim alleging a delay in providing treatment, the plaintiff "must also provide independent evidence that the delay exacerbated the injury or unnecessarily prolonged pain." *Petties*, 836 F.3d at 730–31. Such evidence may include a showing in the plaintiff's medical records that "the patient repeatedly complained of enduring pain with no modifications in care." *Id.* at 731; *Williams v. Liefer*, 491 F.3d 710, 715 (7th Cir. 2007).

### 3.2 Dombeck and LaVoie

First, Defendants do not argue that Plaintiff did not have an objectively serious medical need for treatment related to his diabetes. ECF No. 47. Diabetes is a serious medical condition that can leave to long-term complications or death if untreated. *Miller v. Lemke*, 711 F. App'x 354, 355

(7th Cir. 2018). As such, the Court finds that Plaintiff has satisfied the first prong of the deliberate indifference standard.

Second, the Court finds that no reasonable juror could find that Dombeck or LaVoie were deliberately indifferent to Plaintiff's need for treatment. The Court begins with the well-established rule that when considering claims of deliberate indifference, the Court must give deference to a medical professional's judgment regarding treatment decisions. "A medical professional is entitled to deference in treatment decisions unless 'no minimally competent professional would have so responded under those circumstances.'" *Sain v. Wood*, 512 F.3d 886, 894–95 (7th Cir. 2008) (quoting *Collignon v. Milwaukee County*, 163 F.3d 982, 988 (7th Cir. 1998)). Disagreement between a prisoner and his doctor, or even between two medical professionals, about the proper course of treatment generally is insufficient, by itself, to establish an Eighth Amendment violation. *Johnson v. Doughty*, 433 F.3d 1001, 1013 (7th Cir. 2006). Federal courts will not interfere with a doctor's decision to pursue a particular course of treatment unless that decision represents so significant a departure from accepted professional standards or practices that it calls into question whether the doctor actually was exercising his professional judgment. *Roe*, 631 F.3d at 857; *Sain*, 512 F.3d at 895. "But deference does *not* mean that a defendant automatically escapes liability any time he invokes professional judgment as the basis for a treatment decision." "When the plaintiff provides evidence from which a reasonable jury could conclude that the defendant didn't *honestly* believe his proffered medical explanation, summary judgment is unwarranted." *Zaya*, 836 F.3d at 805 (emphasis in original).

Based on the undisputed facts, the Court finds that no reasonable jury could find that Dombeck was deliberately indifferent to Plaintiff's

medical needs. Dombeck was Plaintiff's assigned care provider from November 2022 until April 2023. Although Plaintiff disagreed with the treatment he received and its effectiveness, this is insufficient to meet the high burden of deliberate indifference. Plaintiff has provided no evidence to show that no minimally competent professional would have so responded under those circumstances. *See Sain*, 512 F.3d at 894–95. While the Court will not reiterate every interaction Dombeck had with Plaintiff during the relevant time period, the following summary addresses the main issues.

In early December 2022, Plaintiff submitted an HSR and indicated that he no longer was going to take his insulin and was going on a hunger strike until he received his requested gabapentin. Dombeck met with Plaintiff days later and explained how dangerous Plaintiff's actions were and how they could lead to serious harm or death. Dombeck informed Plaintiff that HSU would continue to monitor his condition. In the coming days, nursing saw Plaintiff multiple times per day to offer blood sugar and insulin. It is undisputed that Plaintiff was intermittently taking his insulin during this time. Plaintiff alleges generally that he was never offered the opportunity to have his vitals taken during these nursing checks, ECF No. 56 at 2; however, it is unclear what vitals Plaintiff believes should have been monitored and it is further unclear why the failure to do so would amount to deliberate indifference. Again, Plaintiff has offered no evidence to show that no minimally competent medical professional would have treated Plaintiff in any other way.

Dombeck sought advice about Plaintiff's care from Dr. Sukowaty on December 16, 2022. This is further evidence that Dombeck was at least trying to properly care for Plaintiff at this time. Dr. Sukowaty agreed with

Dombeck's course of treatment. Dombeck indicated at that time that, in his opinion, Plaintiff had not yet reached the imminent danger necessary to justify a court order and that HSU would continue to monitor Plaintiff.

Plaintiff makes much of Dombeck's December 29, 2022 communication for nursing staff to not contact an ACP with elevated readings unless Plaintiff was experiencing a change in his condition. Plaintiff again, however, provides no evidence that no minimally competent medical provider would have made this decision. The question is not whether Plaintiff got the best care possible. Additionally, the fact that Plaintiff was hospitalized five times between December 31, 2022 and February 19, 2023 does not mean that Dombeck was deliberately indifferent for not seeking a court order to force insulin on Plaintiff. The undisputed facts show that Plaintiff accepted insulin at the hospital and that he would show improvements thereafter. Furthermore, the fact that Dombeck did eventually seek court intervention is not proof that his failure to do so earlier amounted to deliberate indifference. Dombeck and the medical staff were faced with an incredibly difficult decision as to when exactly was the appropriate time to seek court-ordered medical treatment. The undisputed facts show that Dombeck, in consultation with other medical providers, exercised his professional judgment in making that decision.

In sum, the record before the Court is full of Dombeck's attempts to treat Plaintiff. Plaintiff maintains that he was in imminent danger and that Dombeck should have requested a court order earlier. Plaintiff, however, has offered no evidence calling into question Dombeck's exercise of professional judgment in treating Plaintiff. Plaintiff may have disagreed with Dombeck's course of treatment, but Plaintiff's subjective believe is insufficient to prove deliberate indifference. *Johnson*, 433 F.3d at 1013;

*Walker v. Zunker*, 30 F. App'x 625, 628 (7th Cir. 2002) ("Without any medical evidence of inadequate treatment, a prisoner's self-serving opinion of the quality of treatment is insufficient to raise a genuine issue of material fact."). Further, Plaintiff cannot "'engineer an Eighth Amendment violation' by failing to take his insulin, skipping meals, or going on hunger strikes and then blaming [Dombeck] for the consequences." *Stanton v. Liaw*, No. 3:20-CV-666-JD-MGG, 2022 WL 1641765, at *4 (N.D. Ind. May 24, 2022) (quoting *Rodriguez v. Briley*, 403 F.3d 952, 953 (7th Cir. 2005)).

The question before the Court is not whether Dombeck requested a court order for Plaintiff's forced insulin at the exact perfect moment; indeed, the Court does not have the answer to that question because it has no medical expertise. Instead, the question is whether Dombeck's treatment rose to the level of deliberate indifference. Based on the record before it, the Court finds that no reasonable juror could find Dombeck acted with deliberate indifference to Plaintiff's medical needs. As such, the Court will accordingly grant Defendants' summary judgment motion as to Dombeck.

For largely the same reasons, the Court similarly finds that no reasonable juror could find LaVoie acted with deliberate indifference to Plaintiff's medical needs. LaVoie's interactions with Plaintiff were substantially less than Dombeck's. It is undisputed that LaVoie's involvement with Plaintiff's care was limited to advising Dombek about a potential court order and a few instances of being the on-call doctor contacted about Plaintiff's high blood sugars. As discussed above, Plaintiff has presented no evidence suggesting that the decision not to request a court order earlier rose to the level of deliberate indifference. Nothing in the record suggests that no competent medical professional would have

responded to Plaintiff as LaVoie did. As such, the Court will accordingly grant summary judgment as to LaVoie.[1]

**4.      CONCLUSION**

For the reasons explained above, the Court grants Plaintiff's motion for consideration, construed as a motion for an extension of time. The Court also grants Defendants' motion for summary judgment in full and will accordingly dismiss this action with prejudice. The Court has carefully reviewed the record and finds that Defendants are entitled to judgment as a matter of law.

Accordingly,

**IT IS ORDERED** that Plaintiff's motion for consideration, construed as a motion for an extension of time, ECF No. 53, be and the same is hereby **GRANTED**;

**IT IS FURTHER ORDERED** that Defendants' motion for summary judgment, ECF No. 46, be and the same is hereby **GRANTED**; and

**IT IS FURTHER ORDERED** that this action be and the same is hereby **DISMISSED with prejudice**.

The Clerk of the Court is directed to enter judgment accordingly.

Dated at Milwaukee, Wisconsin, this 26th day of November, 2025.

BY THE COURT:

J. P. Stadtmueller
U.S. District Judge

---

[1]Defendants also moved for summary judgment based on qualified immunity. ECF No. 47 at 11. Because the Court grants summary judgment on the merits, the Court need not reach the question of qualified immunity.

This Order and the judgment to follow are final. A dissatisfied party may appeal this Court's decision to the Court of Appeals for the Seventh Circuit by filing in this Court a notice of appeal within **thirty (30)** days of the entry of judgment. See Fed. R. App. P. 3, 4. This Court may extend this deadline if a party timely requests an extension and shows good cause or excusable neglect for not being able to meet the thirty-day deadline. *See* Fed. R. App. P. 4(a)(5)(A). Moreover, under certain circumstances, a party may ask this Court to alter or amend its judgment under Federal Rule of Civil Procedure 59(e) or ask for relief from judgment under Federal Rule of Civil Procedure 60(b). Any motion under Federal Rule of Civil Procedure 59(e) must be filed within **twenty-eight (28)** days of the entry of judgment. The Court cannot extend this deadline. *See* Fed. R. Civ. P. 6(b)(2). Any motion under Federal Rule of Civil Procedure 60(b) must be filed within a reasonable time, generally no more than one year after the entry of the judgment. The Court cannot extend this deadline. *See id.* A party is expected to closely review all applicable rules and determine what, if any, further action is appropriate in a case.